Filed 7/7/14  P. v. Bennett CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B246567 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA372681) |
| v. | |
| KENNETH BENNETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Kenneth Bennett, appeals his conviction for second degree murder with criminal street gang and firearm use enhancements (Pen. Code, §§ 187, 186.22, subd. (b), 12022.53).[1] He was sentenced to state prison for a term of 40 years to life.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *The shooting.*

On Memorial Day, May 31, 2010,[2] Regina Robertson held a party at her home on 74th Street in Los Angeles. All the guests were friends and family whom Robertson had personally invited. Among them were Christopher Galloway, Deandre Smith and Aaron Loud. Robertson did not know defendant Bennett and he had not been invited to her party.

Neither Loud nor Galloway associated with any gang. Smith was affiliated with the Rolling 60's Neighborhood Crips. Robertson's house was on the borderline between territory claimed by the Rolling 60's and territory claimed by the 8-Tre Gangster Crips.

About 12:30 a.m. that night, Smith, Loud and Galloway were on Robertson's front porch while the party was still going on inside the house. Bennett and another man approached. They were both wearing black hooded sweatshirts even though it was not cold out. Smith testified Bennett, who did all the talking, asked if they could join the party.[3] Smith was worried Bennett and his companion intended to start trouble:

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2010 unless otherwise specified.

[3]     Smith testified he was not "working" the door; he was just out on the porch to get some air.

2

"Q. [By the prosecutor]:  Did you feel that you didn't want them to go into the party?

"A.  Yes.  I felt trouble.

"Q.  Okay. And what else did they say that you remember?

"A.  They asked to get inside the party. I asked them who they knew here, and they couldn't give me any names . . . .

"Q. Do you remember the tone of voice used during this conversation?

"A. Yes, real hostile."

Loud too testified Bennett was acting very hostile:  "The whole time his whole demeanor was aggressive, and . . . just mean and as if we were his enemy."  Bennett was saying, "[Y]eah, where are you all from?  The 8-Tre gangsters?  Why we can't get in the party, statements . . . to that effect.  [¶]  And then [Smith] said . . . wait a minute.  This isn't that type of a party.  It's just kids and family . . . .  [I]t's not that type of . . . party, no gang banging here, you know."

Smith testified Bennett's reference to the 8-Tre Gangster Crips constituted a gang challenge, a declaration by Bennett that he was from the 8-Tre Gangster Crips and everybody better know it.  Smith started moving toward the front door of Robertson's house "[b]ecause I felt scared like I was about to get shot.  There was going to be trouble."  "Q.  And why specifically did you feel that you were about to get shot?  [¶] A.  Because the way the guy was standing, the gesturing, and he had his hands in his pockets the whole time."

Bennett kept reaching his hand in and out of the big front pocket of his hooded sweatshirt in a suspicious manner, and Loud saw the butt of a handgun sticking out of this pocket.[4]  According to Loud, Bennett remained verbally aggressive while Smith was "hesitant, kind of nervous," not raising his voice and not being aggressive in return.

---

[4]  "Q  Okay.  And did you see whether or not he had any anything in his hands?  [¶] A  [Loud]  No.  On second thought, I did see like a butt of the gun.  [¶]  Q  And how

3

Loud testified:

"[A]fter [Smith] told [Bennett] this isn't . . . his party, we have to see what the lady of the house – if you can get in, you know, see what she can do, everyone turned around to walk towards the house.

"Q. Did you do so quickly or slowly?

"A. Slowly.

"Q. And why did you do it slowly?

"A. Just I was nervous. I didn't want to get shot in the back of the head."

Loud testified Smith's conversation with Bennett had been going on for six or seven minutes when Smith said he would check with the homeowner about letting Bennett and his companion into the party. That was when Smith, Loud and Galloway began moving toward the front door.

Asked, "What happened as you were entering into the house?", Loud testified: "As we were turning around, [Smith] led. I followed. [Galloway] was behind me, and the other two people were behind us as we were walking. It seemed like the slowest walk ever. The whole time, as we were walking, [Bennett] kept saying [']8-Tre gangsters. We're going to get into this party. We're trying to get into this party['] . . . ." Then Loud turned around and saw Bennett's companion pointing a small .22 or .25 caliber handgun at Loud's head. For some reason Loud didn't think Bennett's companion was about to shoot him, so he continued into the house. After the front door slammed shut behind him and Smith, Loud heard two or three gunshots in rapid succession. He knew Galloway was still out on the porch, so he began warning people inside the house that Galloway had just been shot.

Smith testified he had broken off the conversation with Bennett and started for the front door:

---

much in inches or what portion of the gun did you see?" Loud answered he saw half an inch of the gun butt.

4

"Q. Did you walk or run towards the house?

"A. Walked.

"Q. And why did you walk?

"A. Because the conversation and tension, I was feeling it, and I had decided to walk away to avoid trouble. If I'm going to be shot, they'd shoot me in the back.

"Q. Were you the first to walk away?

"A. Yes, I was.

"Q. Do you know whether or not anyone walked away behind you?

"A. I believe [Loud] and [Galloway] both walked behind me.

"Q. And what happened next?

"A. I opened the front door, and as soon as I opened the front door, I heard shots, and I dived inside the house."

Smith testified he had not actually planned on asking Robertson if the two men could join the party. Rather, he had said he would check "[j]ust to get away because . . . I was scared so I just said anything just to try to walk away from the situation without getting shot in the face." Even though Bennett was asking to get into the party, Smith did not believe he and his companion had come to Robertson's house in order to socialize: "They came for trouble in my mind."

Robertson testified she heard her party guests screaming and people saying there had been a shooting. She went outside and saw Galloway lying in a fetal position near her front door. Galloway subsequently died of two gunshot wounds: one to his upper left chest and one to his back. The chest wound had been caused by a medium caliber bullet, the back wound by a small caliber bullet. It was not possible to determine which shot had been fired first. Several days later, police found two .25 caliber cartridge casings on Robertson's lawn.

2. *Bennett's arrest*.

On June 17, Loud identified Bennett from a photo array, writing this note: "Nose is similar. Chin and cheek bones look the same. Suspect was the person doing all the talking during the altercation and holding the gun." Loud testified this final comment

5

was a reference to the fact he had seen the gun butt sticking out of Bennett's sweatshirt pocket. When Loud identified Bennett at trial, he testified he was "[o]ne hundred percent" certain Bennett had been one of the two men trying to get into the party that night.

On June 18, an officer spotted Bennett on 85th Street and saw him walk into a residence, leave, and then go into a second residence nearby. Police surrounded the second residence, ordered everyone out, and arrested Bennett. A search of the first residence turned up a .25 caliber semiautomatic handgun. Forensic testing showed conclusively this gun had fired the .25 caliber cartridge casings found on Robertson's lawn. In addition, it was determined that a .38 caliber bullet recovered from the crime scene could not have been fired from the .25 caliber handgun recovered at the time of Bennett's arrest.

Detective Ernesto Mendoza testified that shortly after Galloway's death, police noticed certain gang graffiti at 85th St. and Western Ave., near the location of Bennett's arrest, which identified members of the local 8-Tre Gangster Crips. One of the names in the graffiti was "G-Buk," which police knew to be Bennett's moniker. There was also a derogatory reference to a rival gang, the Neighborhood Crips. Mendoza testified it seemed this graffiti was meant to mark Galloway's killing: "It's sort of like this is a trophy. They're letting everyone know what happened."

Following his arrest, Bennett was questioned by detectives who falsely claimed his DNA had been found on the .25 caliber handgun. At first, Bennett claimed he had just purchased the gun on June 14. But after a while, Bennett told a completely different story about how he had acquired the gun. He admitted going to Robertson's house on the night of the shooting, but said he went alone and unarmed. He wanted to get into the party, but people there started hassling him and then pulled out guns. Shooting erupted and the people at the house shot one of their own friends by mistake. Someone dropped a gun onto the ground. Bennett picked it up, in case he needed it for self-defense, and ran away. During this interview, Bennett began to suspect the detectives had lied to him

6

about the inculpatory evidence and asked them, "Y'all aren't lying to me right?" Although the detectives denied it, Bennett remarked: "I think I fucked over myself."

After the detectives left, Bennett began making telephone calls from a booking cell. He told one person: "[O]nly my hand . . . my fingerprints and DNA was on it, bro. You feel me? That's where I fucked up at, cuz, but look . . . they say that all the people that was there, cuz, they didn't say that I did no shooting or nothing, cuz. They just said that I was there, cuz. And on the set, cuz, I told them people the truth, my nigger."

In another phone call, Bennett told his grandmother, "I shouldn't have said nothing, though, man. It's too late now . . . . [O]h, my God, grandma, I shouldn't have said nothing, man. I shouldn't have said nothing, grandma."

To another person,[5] Bennett said: "I was there. Somebody shot at me." "That's the only thing that they got on me . . . is that I was just there trying to get in." "Yeah, I think I fucked up . . . already by just saying that I was there, though. I shouldn't have said nothing."

Bennett subsequently called the detectives in an apparent attempt to recant his admission to them that he had been present at Robertson's house, saying: "I lied to you all again, man," and "I thought that maybe if I did say I was there . . . ."

Finally, there was a telephone call between Bennett and someone who was apparently a fellow gang member. This person warned Bennett that people had been saying he made incriminating statements to the police, and advised him to decide on a single story and stick to it:

3. *Gang evidence.*

Los Angeles Police Department Officer Kevin Currie testified as a gang expert. He explained the 8-Tre Gangster Crips were rivals of the Rolling 60's Neighborhood Crips in the area where Galloway was killed. Currie had stopped Bennett multiple times, and Bennett admitted he was from the 8-Tre Gangster Crips and his moniker was G-Buk.

---

[5] This person might have been Bennett's father or grandfather.

Bennett had a gang tattoo on his arm and Currie identified him in photographs downloaded from the Internet which depicted Bennett flashing gang signs.

Currie testified it was important for the 8-Tre Gangster Crips to instill fear in the communities that bordered their territory. Individual gang members gained status and respect within the gang by committing crimes.

Currie opined that, given the gang-related nature of their conversation, the unidentified man who told Bennett to stick to one story had likely been a member of the 8-Tre Gangster Crips. This man was probably concerned about the rumor Bennett had incriminated himself to the police because this meant there was a chance Bennett would also implicate other gang members.

Currie testified the phrase "Where are you from?" is a common gang challenge. If the person questioned gives the name of a rival gang or refuses to answer, the challenger will often commit an act of violence. Given a hypothetical question based on the evidence, Currie opined Galloway's shooting had been carried out for the benefit of the 8-Tre Gangster Crips. It would instill fear and respect for Bennett's gang in the community and show that the gang could commit crimes with impunity. If both Bennett and his companion came to the party armed, it was highly likely they were looking for trouble and intended to commit a violent act:

"A. Well, they're going to a party armed with guns so most likely they're looking for trouble. So they're going to this party, and they ask, 'Where are you from?' They're looking for the question (sic), is it positive or negative? And in this case it was non-response [*sic*] which is negative so they shot.

"Q. Would there be any non-violent reason that you would expect an 8-Tre gang member to approach a party in which he did not know anyone inside in Rolling 60's territory, would there be any non-violent reason, based on your background, training and experience for that?

"A. No."

8

4. *Other background matters.*

Bennett did not put on any evidence. There were two trials in this matter. At the first, the jury acquitted Bennett of first degree murder and hung on second degree murder. At the second trial, Bennett was convicted of second degree murder.

## CONTENTIONS

1. There was prosecutorial misconduct.

2. The trial court erred by admitting evidence consisting of unauthenticated photographs.

3. The trial court erred by denying Bennett's request for disclosure of a confidential informant's identity.

4. There was cumulative error.

## DISCUSSION

1. *There was no prosecutorial misconduct.*

Bennett contends the prosecutor committed misconduct by relying on false testimony and making improper comments during closing argument. These claims are meritless.

### a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] [¶] ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.

9

[Citation.]" ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) A defendant who fails to object at trial "waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105.)

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

One particularly egregious form of misconduct occurs when a prosecutor relies on false testimony. " 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted.' [Citation.] Put another way, the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. [Citation.] This obligation applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution [citation], and applies even if the false or misleading testimony goes only to witness credibility [citations]. Due process also bars a prosecutor's knowing presentation of false or misleading argument. [Citation.] As we recently summarized, 'a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence

10

deprives the defendant of due process.' [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 716-717.)

        b. *Discussion.*

           (1) *Prosecutor did not commit misconduct by relying on false testimony.*

              (a) *Background.*

During the testimony of Kevin Currie, the prosecution gang expert, the following colloquy occurred:

"Q. What does . . . Buk mean?

"A. Buk – well, per the Urban [D]ictionary, it means to kill someone without care."

Asked if the online Urban Dictionary was something he referred to in the course of his anti-gang work, Currie explained he sometimes consulted the Internet when faced with slang terms he did not understand.

During closing argument, the prosecutor referred to this testimony on two occasions. The first time, while pointing out how strongly gang-identified Bennett was, the prosecutor said: "Everything that he says, you can't get one line out without swearing on the gang, saying on gangster, derogatory racial terms.[6] Everything that he says is about the gang, and his moniker – he's not an individual that's given the moniker of something innocuous like Football. You've heard that . . . his moniker that he's known by in his gang is G-Buk, and what that means, according to Officer Currie . . . , G-Buk is a person that . . . kills without regard, and that's exactly what happened in this case. He killed without regard."

---

[6] The prosecutor was referring to the way Bennett talked, as exemplified by this excerpt: "They . . . were telling me all kinds of shit I've been doing, my nigger. On movement, cuz. On the set, they've been – that's when they've been following us and all that, but on gangsters, my nigger, but — but look, cuz, on gangsters, they — the only thing they really got on me, cuz, I'm going say is the burner, cuz."

11

Then, the prosecutor ended the rebuttal portion of her closing argument by saying: "This case is very simple if you just use your common sense and don't speculate. There is a smoking gun in this case. There is a person who has committed his life to being an individual, G-Buk, someone who kills without regard, and Christopher Galloway paid the price, and what really happened to him that day was a picture of the greater gang violence that's going on."

(b) *Discussion.*

Bennett contends Currie's testimony and the prosecutor's closing argument violated due process because "the Urban Dictionary does *not* 'define' the term 'Buk' as 'to kill someone without care.' Currie's testimony was false and misleading. The prosecution made no attempt to correct this false and misleading testimony and, in fact, capitalized on it in her closing argument, called it her 'smoking gun' and argued that appellant did just what his moniker states he does, 'kill without regard.' The introduction of this false testimony, the failure to correct the testimony and the use of the testimony to secure appellant's conviction was prosecutorial misconduct and violated appellant's Fifth, Sixth and Fourteenth Amendment rights to a fair trial and due process of law."

The seminal case establishing this sub-category of prosecutorial misconduct is *Napue v. Illinois* (1959) 360 U.S. 264 [79 S.Ct. 1173], which gave rise to the following rule: "To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material. [Citations.] Perjury is defined as testimony 'given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.' [Citation.]" (*United States v. McNair* (11th Cir. 2010) 605 F.3d 1152, 1208, fn. omitted.)

"[A] *Napue* violation – a presentation to a fact-finder of false testimony knowing it to be false – results in the reversal of a conviction if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' [Citation.] [¶] In *Napue*, the prosecutor elicited and did not correct what he knew to be false testimony – that the state's principal witness had not been promised any consideration by the State in

12

exchange for his testimony. [Citation.] . . . [¶] The Court reversed Napue's conviction on the ground that the false testimony 'may have had an effect on the outcome of the trial.' [Citation.] As explained in subsequent opinions applying the *Napue* standard, 'a new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' [Citations.]**7** [¶] . . . [¶] In short, prosecutorial misconduct of the kind that occurred here violates the constitutional rights of the defendant and requires a reversal of the conviction if (1) the testimony was actually false, (2) the prosecutor knew it was false, and (3) the false testimony was material (i.e., there is a reasonable likelihood that the false testimony could have affected the judgment). [Citation.]" (*Dow v. Virga* (9th Cir. 2013) 729 F.3d 1041, 1047-1048, fn. omitted.)

Bennett argues: "In this case, misconduct occurred when Currie falsely testified that 'per the Urban Dictionary,' the term 'Buk' mean[s] 'to kill someone without care.' Here, there was no dispute that appellant's moniker was spelled 'G-Buk.' Contrary to Currie's testimony, the Urban Dictionary defines the term 'Buk' as used in appellant's moniker, as 'a Polish word meaning King, or other person of great power.' " Bennett then argues that, even assuming Currie reasonably altered the spelling of "Buk" to the more common "Buck," the Urban Dictionary's closest definitions, which range from "feeling angry" to "getting wild and uncontrollably crazy" to "killing someone," fall well short of the extreme callousness denoted by "to kill someone without care."

Bennett asserts: "A review of the Urban Dictionary reveals that Currie's testimony about the meaning of appellant's moniker 'G-Buk,' was false and misleading.

---

**7** "Although the government's knowing use of false testimony does not automatically require reversal, courts apply a less demanding materiality standard to *Napue* errors: whether 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' [Citation.] This materiality standard is, in effect, a form of harmless error review, but a far lesser showing of harm is required under *Napue*'s materiality standard than under ordinary harmless error review. [Citations.] *Napue* requires us to determine only whether the error could have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error would have done so." (*Dow v. Virga, supra,* 729 F.3d at p. 1048, fn. omitted.)

13

There is not a single entry in the Urban Dictionary defining either 'Buk' or 'Buck' as 'to kill someone without care.' Thus, it can only be assumed that Currie falsified or created the definition in order to comport with the prosecution's theory of the case, namely, that appellant shot at Galloway 'without regard,' thereby committing a second degree murder." "Currie had to know that the definition he proffered was false. Either Currie did not consult the Urban Dictionary, which would make his testimony indicating that he did false, or, if he did look the term up in the Urban Dictionary, he would know that the definition 'to kill someone without care' was not contained in the list of definitions, and thus, he would know his testimony was false. Under either scenario, Currie had to have known his testimony was false."

We disagree. There is a necessary distinction between intentional falsehoods and testimony that may be merely mistaken, inaccurate, inconsistent, or accidentally untrue. The two cases Bennett cites involved actual perjury. In *Napue*, the principal prosecution witness testified he had not been given any promises in return for his testimony. This was untrue. The prosecutor knew it was untrue but failed to correct it. In *Dow*, a police detective testified Dow had asked each participant in an identification lineup to wear a band-aid under his right eye, just where Dow happened to have a small scar. In truth, it had been the defendant's attorney who made the request. Despite knowing the testimony was false, the prosecutor told the jury that, by asking for the band-aids to hide his scar, Dow had demonstrated his consciousness of guilt.

But here there was no evidence Currie committed perjury as opposed to merely giving mistaken testimony. Just because he miscited the Urban Dictionary's definition does not prove he was committing perjury. (See *People v. Vines* (2011) 51 Cal.4th 830, 874 [because "[m]ere inconsistencies between a witness's testimony and her prior statements do not prove the falsity of the testimony," defendant "fail[ed] to establish that the prosecutor presented false testimony or failed to correct such testimony"]; *Henry v. Ryan* (9th Cir. 2013) 720 F.3d 1073, 1084 [although detective's testimony about his own actions at the crime scene was contradicted by defense experts, defendant "provided no evidence that [the detective] *knew* his testimony was inaccurate at the time he presented

14

it, rather than [his] recollection merely being mistaken, inaccurate or rebuttable. [Defendant's] conclusory assertion that, because [the detective] must have known where he stepped while investigating the crime scene, any testimony inconsistent with the truth must be not only inaccurate but also perjured does not constitute evidence sufficient to make out a *Napue* claim."].)

Bennett has not cited any case demonstrating that the kind of testimony Currie gave about the definition of "Buk" constituted *Napue* error. We conclude the prosecutor's introduction of, and reliance on, Currie's testimony did not amount to the knowing use of perjured testimony.

(2) *Prosecutor did not commit misconduct by making improper comments during closing argument.*

(a) *Background.*

Bennett's second set of prosecutorial misconduct claims stems from the following portion of the prosecutor's closing argument:

"In deciding whether the People have proved the case beyond a reasonable doubt, you must impartially compare and consider all of the evidence. Don't disregard evidence like the defense is asking you to that was received throughout the entire trial.

. . . . . . . . . . . . . . .

"You have to trust it. If there was an inconsistent statement or something in the police report provided to the defense that's recorded, their position, you would hear from them. They have the same subpoena power of the court. They have the discovery provided. They have the recorded statements. They have the telephone calls.

"You have to trust that the defense is doing their job, and if there was evidence that was favorable to them, that it would have been presented in court, but you didn't hear any of that –

"[Defense counsel]: Objection.

. . . . . . . . . . . . . . .

"The Court: Ground?

"[Defense counsel]: Burden shifting.

15

"The Court: Okay. The burden of proof always remains with the prosecution, Ladies and Gentlemen."

(b) *Discussion*.

Bennett argues: "The prosecutor's comments constituted misconduct. Not only did the prosecutor vouch for its [*sic*] evidence by suggesting that there was nothing outside the evidence presented which would benefit the defense, but also vouched for the fact that defense counsel was competent, was doing her job and would have brought in evidence that was favorable if it existed. The prosecutor's comments also impermissibly shifted the burden of proof to the defense by suggesting that appellant had the burden to bring forth evidence that would have supported their position and undermined the prosecution's case."

It is improper for a prosecutor to imply there is additional evidence outside the record because this amounts to unsworn testimony violative of a defendant's rights to confrontation and effective counsel. (*People v. Bolton* (1979) 23 Cal.3d 208, 212-213; see *People v. Herring* (1993) 20 Cal.App.4th 1066, 1076-1077 [prosecutor's implication he knew facts not in evidence amounted to unsworn testimony and required reversal].) However, a prosecutor may argue inferences that are based on what happened at trial as opposed to facts outside the record (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030), and "the prosecutor may comment on the state of the evidence, including the failure of the defense to introduce material evidence or to call witnesses." (*People v. Mincey* (1992) 2 Cal.4th 408, 446.)

Bennett says he recognizes all of this but, nevertheless, he argues that "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence. [¶] Here, the prosecutor first committed misconduct when she went beyond the evidence presented and offered that there were no inconsistent statements or favorable facts in the police reports or recorded statement that were not presented to the jury. . . . The prosecutor then impermissibly vouched for the competency of defense counsel by

16

arguing that 'you have to trust that the defense is doing their job, and if there was evidence that was favorable to them, that it would have been presented.' These comments by the prosecutor went beyond the evidence presented and amounted to conclusive testimony that there was nothing in the materials outside the evidence presented . . . ."

Not only did the prosecutor's statements not amount to "conclusive testimony" of anything, but there was no misconduct. The prosecutor was fairly commenting on the fact the defense had failed to bring forth any evidence contradicting the People's version of events. Hence, for example, *People v. Jasso* (2012) 211 Cal.App.4th 1354, found nothing wrong with the following prosecutorial argument: " 'Once again, if that evidence was there, if there actually was evidence of an accident, [defense counsel], as good an attorney as he is, would have presented it, but there is no evidence. We [don't] hear any evidence that there was an accident, because it was not there, because it was not an accident.' " (*Id*. at p. 1370.)

In sum, we conclude Bennett has failed to establish either that the prosecution relied on false testimony, or that the prosecutor's closing argument was improper.

2. *Admission of unauthenticated photographs from the Internet was at most only harmless error.*

Bennett contends the trial court erred by admitting into evidence photographs downloaded from the Internet which showed him flashing gang signs and wearing a sweatshirt identical to the perpetrator's sweatshirt. Bennett asserts these photographs should have been excluded because they were insufficiently authenticated, and that their admission requires the reversal of his conviction. We disagree.

17

a.  *Background*.

The prosecution put into evidence three gang photographs (People's exhibits 37, 38 and 41), two of which showed Bennett flashing gang hand signs.  At the first trial in this matter, the defense did not dispute Bennett's gang membership, but argued the photographs were not properly authenticated because they had been downloaded from an unidentified Facebook page.  The prosecutor argued the photographs were admissible because it was obviously Bennett in the pictures and, moreover, the gang expert would testified he could recognize Bennett and other gang members shown in the pictures.  The trial court overruled the defense objection, finding that so long as the expert could recognize people in the photographs there was no foundation problem.

At the second trial, Currie testified exhibit 37, which showed Bennett wearing a black hooded sweatshirt with a pocket in the front and flashing a gang sign, had been downloaded from the Internet by his partner at some point after Bennett's arrest.  Exhibit 38 showed Bennett and three other members of the 8-Tre Gangster Crips flashing gang signs.  Currie testified he was unsure when this photograph had been taken, but he believed it was sometime in 2010.  Exhibit 41 showed numerous 8-Tre Gangster Crips members flashing gang signs; Bennett did not appear in this photograph.

b.  *Legal principles.*

"No photograph or film has any value in the absence of a proper foundation.  It is necessary to know when it was taken and that it is accurate and truly represents what it purports to show.  It becomes probative only upon the assumption that it is relevant and accurate.  This foundation is usually provided by the testimony of a person who was present at the time the picture was taken, or who is otherwise qualified to state that the representation is accurate.  In addition, it may be provided by the aid of expert testimony [even if] there is no one qualified to authenticate it from personal observation.  When authenticated by a witness from personal observation its admission into evidence presumes confidence in that witness' veracity" (*People v. Bowley* (1963) 59 Cal.2d 855, 862.)

18

Applying this traditional rule to the modern world of computers and the World Wide Web, *People v. Beckley* (2010) 185 Cal.App.4th 509, held "the prosecution's failure to authenticate a photograph and 'gang roster' downloaded from Internet Web sites should have barred their admission . . . ." (*Id.* at p. 511.) In *Beckley*, in order to rebut testimony from defendant's girlfriend Fulmore "that she did not associate with the Southside Compton Crips and that she insisted Beckley stop his association with the gang, the prosecution offered a photograph purportedly showing Fulmore flashing the Southside Compton Crips gang sign. Detective Schoonmaker testified that he downloaded the photograph from Beckley's home page on the Internet Web site MySpace." (*Id.* at p. 514.) "Although defendants conceded that the face in the MySpace photograph was Fulmore's, the record does not contain the kind of evidence described in *Bowley* or any other evidence sufficient to sustain a finding that it is the photograph that the prosecution claims it is, namely, an accurate depiction of Fulmore actually flashing a gang sign. Schoonmaker could not testify from his personal knowledge that the photograph truthfully portrayed Fulmore flashing the gang sign and . . . no expert testified that the picture was not a ' "composite" or "faked" ' photograph. Such expert testimony is even more critical today to prevent the admission of manipulated images . . . . Recent experience shows that digital photographs can be changed to produce false images. [Citation.] Indeed, with the advent of computer software programs such as Adobe Photoshop 'it does not always take skill, experience, or even cognizance to alter a digital photo.' [Citation.] Even the Attorney General recognizes the untrustworthiness of images downloaded from the internet, quoting the court's warning in *St. Clair v. Johnny's Oyster & Shrimp, Inc.* (S.D.Tex.1999) 76 F.Supp.2d 773, 775, that '[a]nyone can put anything on the Internet. No web-site is monitored for accuracy and *nothing* contained therein is under oath or even subject to independent verification absent underlying documentation. Moreover, the Court holds no illusions that hackers can adulterate the content of *any* web-site from *any* location at *any* time.' " (*Id.* at p. 515-516)

On the other hand, *People v. Valdez* (2011) 201 Cal.App.4th 1429, concluded Internet photographs downloaded from the defendant's own MySpace page were properly admitted: "[W]hile all writings must be authenticated before they are received into evidence [citation], the proponent's burden of producing evidence to show authenticity [citation], is met 'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]' [Citation.] The author's testimony is not required to authenticate a document [citation]; instead, its authenticity may be established by the contents of the writing [citation] or by other means [citation]. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]' [Citation.] ' "[L]ike any other material fact, the authenticity of a [document] may be established by circumstantial evidence. . . ." ' [Citation.]" (*Id*. at p. 1435.)

c. *Discussion*.

Bennett contends the trial court erred by admitting the downloaded photographs because no foundation had been laid and they could not be authenticated: "In this case, like in *Beckley* and unlike in *Valdez*, the record fails to contain the kind of evidence described in *Bowley* or any other evidence sufficient to sustain a finding that Exhibits 37, 38 and 41 accurately portray what the prosecution claims they portray, namely, an accurate depiction of appellant and fellow gang members, who are purportedly throwing gang signs associated with the 8 Trey gang."

The Attorney General replies: "But here, officer Currie was qualified as an expert on [the 8-Tre Gangster Crips], meaning he could identify the meaning of the gang signs; he also testified that, given his personal knowledge of the men depicted, one of the photographs appeared to have been taken around 2010. The People did not seek to admit the photographs for any purpose requiring authentication beyond what officer Currie could provide."

20

We need not decide whether these Internet photographs were properly authenticated, however, because any error was clearly harmless.[8] There is no doubt Bennett was a member of the 8-Tre Gangster Crips. He had admitted his membership to Currie, and his jailhouse phone call showed him to be quite concerned about the gang ramifications of having talked to the police. As the Attorney General points out, the photographs were not "particularly damaging to the defense. For example, appellant is not depicted holding a gun or committing any violent acts."

In response, Bennett asserts "[t]he picture was more damaging to appellant's case than had he simply been holding a gun because the prosecution was able to argue that he was, in fact, the person wearing that identical sweatshirt on the night of the shooting." But there was overwhelming evidence showing Bennett was one of the two men who approached Robertson's house that night and demanded entrance to the party. Loud made an extremely positive identification based on having observed Bennett during a confrontation lasting six or seven minutes, in which Bennett did all the talking and his companion said nothing. Bennett's presence at Roberson's house was corroborated by his jailhouse conversations, in which he repeatedly acknowledged having made a big mistake by admitting to the police he had been there that night. Indeed, the question of Bennett's identity as one of the two interlopers was so far from dispute that defense counsel's closing argument essentially conceded this fact.

We conclude that any error in admitting this evidence was harmless.

---

[8]     Bennett argues that, "[s]ince the admission of the evidence violated appellant's federal constitutional rights to due process and a fair trial," the proper harmless error standard is *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824]. But Bennett never demonstrates this; he merely assumes it without citing any authority showing why *People v. Watson* (1956) 46 Cal.2d 818, does not apply. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1298 [erroneous admission of evidence is reviewed under the *Watson* standard].)

21

3. *Trial court did not err by denying disclosure of confidential informant.*

Bennett contends the trial court erred by denying disclosure of a confidential informant's identity. This claim is meritless.

Prior to trial, Bennett moved for an order requiring the prosecution to disclose the identity of a confidential informant who had given the police information used to support a search warrant. After reviewing the sealed portion of the search warrant affidavit, the trial court ruled there was "no possibility that the informant could give information on the issue of guilt or innocence which might tend to exonerate Mr. Bennett."

The parties agree the question whether access to the confidential informant's identity was properly denied should be resolved by having this court review the sealed portion of the search warrant affidavit. This is the correct procedure. "[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.] An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing ' " 'some evidence' " ' on this score. [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 159-160.)

We have reviewed this material and, based on that review, we conclude the trial court properly determined the confidential informant "could not have provided any evidence that, to a reasonable possibility, might have exonerated defendant." (*People v. Lawley, supra,* 27 Cal.4th at p. 160.)

4. *Cumulative error.*

Bennett contends his conviction must be reversed for cumulative error. "Because we identified only one harmless error, the claim of cumulative error is without merit." (*People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6 ["Since we have found only one error properly preserved for appeal, we need not address appellant's contention that cumulative error at trial requires reversal."].)

22

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.